**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**
**CIVIL ACTION NO. 3:22-CV-00360-RGJ**

**KATASHA J.,**
*for K.E., a minor*                                                                         **PLAINTIFF**

**VS.**

**KILOLO KIJAKAZI,**
*Acting Commissioner of Social Security*                                  **DEFENDANT**

**REPORT AND RECOMMENDATION**

In December of 2013, minor child K.E. was found disabled and was awarded child's supplemental security income benefits, with an established onset date of July 17, 2014. Following a continuing disability review conducted in June of 2019, however, the Social Security Administration determined K.E.'s disability had ceased as of June 25, 2019. K.E.'s mother, Katasha J., on behalf of K.E., now appeals the final determination of the Commissioner of Social Security ceasing K.E.'s child disability benefits. (DN 1). Katasha J. has filed a Motion for Summary Judgment (DN 11) with a supporting memorandum (DN 11-1). The Commissioner has responded in a Fact and Law Summary. (DN 16). The time for Katasha J. to file a reply has expired.

The District Judge has referred the case to the undersigned United States Magistrate Judge for consideration and preparation of a Report and Recommendation, as authorized in 28 U.S.C. § 636(b)(1)(B). (DN 10).

I. Findings of Fact

Claimant K.E. ("Claimant") was born on July 17, 2014. Because Claimant met the requirements of Listing 104.06D for congenital heart disease, he was awarded child supplemental security income benefits. (Tr. 72, 86-101). Listing 104.06D applies only to infants under 12 months of age at the time of filing, with life-threatening congenital heart impairment that will require or

already has required surgical treatment in the first year of life, and the impairment is expected to be disabling until at least age one. 20 C.F.R. Part 404, Subpart P, Appendix 1, § 104.06D. On April 18, 2016, the Social Security Administration (SSA) reviewed Claimant's disability status and found he was still disabled. (Tr. 102-04). The SSA again conducted a continuing disability review (CDR) of Claimant's status in June of 2019. (Tr. 73-85). Following this review, the SSA determined that Claimant's disability had ceased as of June 25, 2019. (Tr. 73-85). Claimant sought reconsideration of the Commissioner's cessation of benefits (Tr. 114-16), which was denied (Tr. 140-41).

At Claimant's request, Administrative Law Judge Candace McDaniel ("ALJ McDaniel") conducted a telephonic hearing from Louisville, Kentucky on April 6, 2021.[1] (Tr. 36, 147-49). Claimant's mother attended the hearing. (Tr. 38). But neither Claimant, nor a representative, were present for the hearing. (*Id.*). During the hearing, Claimant's mother testified to the following. Claimant is six years old and lives in a house with his mother, grandfather, sister, and brother. (Tr. 42-43). He briefly attended Kindergarten at Shacklette Elementary School during the 2019-2020 school year, but he is now homeschooled due to concerns with exposure to the Covid-19 virus. (Tr. 43-44). Claimant's mother expects him to enroll in school again for the first grade. (Tr. 46). She characterizes Claimant as very smart but a little behind in pronunciation and grammar. (Tr. 48, 68).

Claimant sees a cardiologist once a year. (Tr. 50). At home, Claimant's mother checks Claimant's oxygen one to two times per day using a pulse ox. (Tr. 51). She does not journal Claimant's pulse ox readings. (Tr. 65). She states a good pulse ox for Claimant is 85%. (Tr. 51-52). When Claimant is sleeping or resting, his pulse ox can drop to 78% or 79%. (Tr. 66). Claimant

---

[1] ALJ McDaniel held the hearing by telephone because Claimant's mother was unable to appear in person. (Tr. 198).

can walk, get dressed, and tie his shoes, but cannot run because of his heart and low muscle tone. (Tr. 53). And Claimant reportedly snaps his fingers and stands on his tip toes when he gets anxious. (Tr. 67-68).

At the end of the hearing, ALJ McDaniel indicated that she would request updated records from Claimant's cardiologist, from Kosair Children's Hospital, and from Claimant's pediatrician's office before rendering her decision. (Tr. 69). On June 9, 2021, ALJ McDaniel issued a written decision, finding Claimant's disability ended as of June 25, 2019. (Tr. 17-30).

## II. ALJ McDaniel's Decision

ALJ McDaniel followed the three-step sequential evaluation process promulgated by the Commissioner for continuous disability review in child's cases, *see* 20 C.F.R. 416.994a(b), and made the following findings:

(1) The most recent favorable medical decision finding that the claimant was disabled is the determination dated April 28, 2016. This is known as the "comparison point decision" or CPD.

(2) At the time of the CPD, the claimant had the following medically determinable impairment: hypoplastic right side syndrome. This impairment was found to meet section(s) 104.06D of 20 CFR Part 404, Subpart P, Appendix 1.

(3) Medical improvement occurred as of June 25, 2019 (20 C.F.R. 416.994a(c)).

(4) Since June 25, 2019, the impairment that the claimant had at the time of the CPD has not met or medically equaled section(s) 104.06(A)(2), of 20 CFR Part 404, Subpart P, Appendix 1 as that listing was written at the time of the CPD (20 CFR 416.925 and 416.926).

(5) The Claimant was born on July 17, 2014. Therefore, he was a preschooler, as of June 25, 2019. The claimant is currently a school-age child. (20 CFR 416.926a(g)(2)).

(6) Since June 25, 2019, the impairment that the claimant had at the time of the CPD has not functionally equaled the Listings of Impairments (20 CFR 416.994a(b)(2) and 419.926a and SSR 05-03p).

(7) The medical and other evidence establish that the claimant:

    a. did not have an impairment at the CPD that was not considered at that time; and

    b. has not developed any additional impairments subsequent to the CPD.

(8) Since June 25, 2019, the claimant has not had an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.925 and 416.926).

(9) Since June 25, 2019, the claimant has not had an impairment or combination of impairments that functionally equals the listings (20 CFR 416.924(d) and 416.926a).

(10) The Claimant's disability ended as of June 25, 2019, and the claimant has not become disabled again since that date (20 CFR 416.994a).

(Tr. 20-30).

Claimant administratively appealed ALJ McDaniel's decision. (Tr. 200-01). The Appeals Council declined review, finding no basis for changing the ALJ's decision. (Tr. 1). At that point, the ALJ's denial became the final decision of the Commissioner, and Claimant appealed to this Court. (DN 1).

### III. Standard of Review

When reviewing the Administrative Law Judge's decision to deny disability benefits, the Court may "not try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (citations omitted). Instead, the Court's review of the Administrative Law Judge's decision is limited to an inquiry as to whether the Administrative Law Judge's findings were supported by substantial evidence, 42 U.S.C. § 405(g); *Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001) (citations omitted), and whether the Administrative Law Judge employed the proper legal standards in reaching his conclusion. *See Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 213 (6th Cir. 1986). Substantial evidence exists "when a reasonable mind could accept the evidence as adequate to support the challenged conclusion, even if that evidence could support a decision the

4

other way." *Cotton v. Sullivan*, 2 F.3d 692, 695 (6th Cir. 1993). The Supreme Court has clarified "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high[.]" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citations omitted).

### A. The Commissioner's Sequential Evaluation Process

The Social Security Regulations provide a three-step sequential evaluation process for evaluating a child under the age of eighteen's claim of disability. 20 C.F.R. § 416.924. These three steps can be summarized as follows:

(1) Is the child engaged in substantial gainful activity?

(2) Does the child have a severe impairment?

(3) Does the child have an impairment that satisfies the duration requirement and meets, medically equals, or functionally equals the criteria of a listed impairment from 20 CFR Part 404, Subpart P, Appendix 1?

*Id.* To meet a listing from Appendix 1, the child claimant must establish both the diagnostic and severity criteria. 20 C.F.R. § 416.925(d). To "medically equal" a listing, the child claimant must prove the impairment is "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 416.926(a). In evaluating medical equivalence, the ALJ considers "all evidence in [the] case record about the impairment(s) and its effects[,]" including the opinions by medical or psychological consultants designated by the Commissioner. *Id.* at (c).

If the claimant's impairment does not meet or medically equal any listing in Appendix 1, the ALJ will assess whether the impairment results in limitations severe enough to functionally equal a listing. 20 C.F.R. § 416.926a(a). This evaluation requires the ALJ to consider the degree of limitation caused by the impairment in six broad areas of functioning, referred to as domains: (i) acquiring and using information; (ii) attending and completing tasks; (iii) interacting and relating with others; (iv) moving about and manipulating objects; (v) caring for yourself; and (vi)

health and physical well-being. *Id.* at (b)(1)(i)-(vi). Where a claimant's impairment results in "marked" limitations in two of the six domains or results in an "extreme" limitation in one of the six domains, the impairment is considered severe enough to functionally equal the listings. *Id.* at (a). To be considered "marked," the limitation must interfere "seriously" with the child's ability to independently initiate, sustain, or complete activities. *Id.* at (e)(2)(i). And an "extreme" limitation exists when the child's impairment(s) interferes "very seriously" with the child's ability to independently initiate, sustain, or complete activities. *Id.* at (e)(3)(i).

## IV. Conclusions of Law

Listing 104.06 requires proof of:

Congenital heart disease, documented by appropriate medically acceptable imagine (see 104.00A3d) or cardiac catheterization, with one of the following:

A. Cyanotic heart disease, with persistent, chronic hypoxemia as manifested by:

1. Hematocrit of 55 percent or greater on two evaluations 3 months or more apart within a consecutive 12-month period (see 104.00A3e); or

2. Arterial O2 saturation of less than 90 percent in room air, or resting arterial Po2 of 60 Torr or less; or

3. Hypercyanotic spells, syncacope, characteristic squatting, or other incapacitating symptoms directly related to documented cyanotic heart disease; or

4. Exercise intolerance with increased hypoxemia on exertion.

20 CFR Part 404, Subpart P, Appendix 1, Listing 104.06.

Claimant argues he meets or medically equals (A)(2) of Listing 104.06 based on his mother's testimony at the administrative hearing that a "good level" for his O$_2$ saturations is 85% and that the night before the hearing his O$_2$ saturation was 82%. (DN 11-1, at PageID # 779-80). Claimant asserts the Listing does not specify how frequently saturation below 90% must occur. He also points out two documented instances of his O$_2$ levels falling below 90% in August of 2019

and May of 2020. (*Id.*). Claimant concludes that his continued disability would have been established had the ALJ properly accounted for all of Claimant's limitations and properly evaluated his functional abilities in the relevant childhood domains. (*Id.*).

The Commissioner responds that ALJ McDaniel appropriately found Claimant's impairment did not satisfy Listing 104.06 because the record contained no evidence of persistent $O_2$ saturations under 90% for a continuous period of 12 months. (DN 16, at PageID # 795-96).

First, any argument Claimant makes regarding the functional equivalence of his impairment is deemed waived. Claimant merely makes passing reference to ALJ McDaniel's evaluation of "his functional abilities in the relevant childhood domains" in his Conclusion. But he makes no effort to develop this claim. Because Claimant mentions this issue in a cursory manner, "unaccompanied by some effort at developed argument," the Court recommends his argument be deemed waived. *Rice v. Comm'r of Soc. Sec.*, 169 F. App'x 452, 454 (6th Cir. 2006) ("It is well established that 'issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (quoting *United States v. Layne*, 192 F.3d 556, 566 (6th Cir. 1999) (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997))).

Claimant's efforts at arguing his impairment meets or medically equals the criteria of Listing 104.06(A)(2) are not much stronger. His characterization that the regulations do not specify how frequently saturation below 90% must occur is incorrect. As the Commissioner points out, Listing 104.06 requires "persistent, chronic hypoxemia[.]" Listing 104.00 provides an introduction to the category of listings that 104.06 falls into and defines "persistent" as "the longitudinal record show[ing] that, with few exceptions, the required finding(s) has been present, or is expected to be present for a continuous period of at least 12 months, such that a pattern of continuing severity is

7

established." 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 104.00A(3)(b).

ALJ McDaniel considered the longitudinal record in evaluating Claimant's impairment under Listing 104.06(A)(2). In finding Claimant's impairment did not meet or medically equal the Listing, ALJ McDaniel noted Claimant's $O_2$ saturation of 87% in August of 2019 when he had a fever and respiratory virus. (Tr. 21). ALJ McDaniel also noted Claimant's $O_2$ saturation of 86% in May of 2020, when his mother reported cyanosis. (*Id.*). But because the remainder of Claimant's $O_2$ saturation readings during the relevant period were above 90%, the ALJ determined Claimant could not meet (A)(2) of Listing 104.06. (*Id.*).

Though Claimant's mother testified that an 85% $O_2$ saturation was "good" for Claimant and that his $O_2$ registered at 82% the night before the hearing, such testimony conflicts with the longitudinal clinical record. Medical records spanning twelve months recorded Claimant's $O_2$ saturation levels as follows: 99% on May 14, 2019 (Tr. 538, 548, 676); 98% on May 17, 2019 (Tr. 538, 555, 676); 95% on May 28, 2019 (Tr. 538, 558, 676); 90% on August 12, 2019 (Tr. 610); 98% on August 13, 2019 (Tr. 676, 688); 95% on October 21, 2019 (Tr. 602); 98% on December 6, 2019 (Tr. 676); 92% on March 4, 2020 (Tr. 597, 662), and 99% on June 22, 2020 (Tr. 676, 708). Notably, in May of 2020, Claimant's mother reported to his physician that although Claimant's $O_2$ had dropped to 83-84% "at times" during the past week, his levels were "usually 90-91%."[2] (Tr. 700).

The two instances where Claimant had recorded $O_2$ saturation levels below 90% seem to be the exception to Claimant's otherwise stable levels. Though the medical records from Claimant's May 15, 2020 appointment state his $O_2$ level as 86%, the visit was conducted using

---

[2] It appears Claimant's mother gave somewhat conflicting information during the May 15, 2020 telehealth visit by first stating Claimant's $O_2$ levels are usually 90-91%, then later saying Claimant's normal $O_2$ parameters are between 88-91%. (Tr. 700).

8

...

telehealth. (Tr. 700-01). The visit notes do not explain how the pulse-ox measurement was obtained. (Tr. 700-01). And Claimant's mother reported during that same visit that Claimant's $O_2$ levels were "usually 90-91%" and that his normal O2 parameters are "between 88-91%." (Tr. 700). The second of Claimant's below 90% readings occurred when he was dealing with illness. The August 28, 2019 measure of 87% was taken around the time Claimant had a respiratory illness and fever. (Tr. 730). His cardiologist indicated during that visit that Claimant's "current issues are more related to the cough and respiratory viruses than a significant change in hemodynamics." (Tr. 731). That the August 2019 measure of 87% was a one-off, rather than Claimant's baseline, is further supported by the two other $O_2$ saturation readings Claimant had on the same day, which bother registered at 91%. (Tr. 676, 692).

The record simply does not support Claimant meeting or medically equaling the criteria from Listing 104.06(A)(2) of persistent, chronic hypoxemia as manifested by $O_2$ saturation of less than 90%. Nor has Claimant put forth any evidence or argument that he meets or medically equals the other criteria from subsections (1), (3) or (4) of Listing 104.06(A). Accordingly, ALJ McDaniel's decision is supported by substantial evidence in the record and comports with applicable law.

## V. Recommendation

For the foregoing reasons, the Court **RECOMMENDS** the Commissioner's decision be **AFFIRMED**.

Regina S. Edwards, Magistrate Judge
United States District Court

July 7, 2023

telehealth. (Tr. 700-01). The visit notes do not explain how the pulse-ox measurement was obtained. (Tr. 700-01). And Claimant's mother reported during that same visit that Claimant's $O_2$ levels were "usually 90-91%" and that his normal O2 parameters are "between 88-91%." (Tr. 700). The second of Claimant's below 90% readings occurred when he was dealing with illness. The August 28, 2019 measure of 87% was taken around the time Claimant had a respiratory illness and fever. (Tr. 730). His cardiologist indicated during that visit that Claimant's "current issues are more related to the cough and respiratory viruses than a significant change in hemodynamics." (Tr. 731). That the August 2019 measure of 87% was a one-off, rather than Claimant's baseline, is further supported by the two other $O_2$ saturation readings Claimant had on the same day, which bother registered at 91%. (Tr. 676, 692).

The record simply does not support Claimant meeting or medically equaling the criteria from Listing 104.06(A)(2) of persistent, chronic hypoxemia as manifested by $O_2$ saturation of less than 90%. Nor has Claimant put forth any evidence or argument that he meets or medically equals the other criteria from subsections (1), (3) or (4) of Listing 104.06(A). Accordingly, ALJ McDaniel's decision is supported by substantial evidence in the record and comports with applicable law.

## V. Recommendation

For the foregoing reasons, the Court **RECOMMENDS** the Commissioner's decision be **AFFIRMED**.

Regina S. Edwards, Magistrate Judge
United States District Court

July 7, 2023

NOTICE

Therefore, under the provisions of 28 U.S.C. " 636(b)(1)(B) and (C) and Fed.R.Civ.P. 72(b), the Magistrate Judge files these findings and recommendations with the Court and a copy shall forthwith be electronically transmitted or mailed to all parties. Within fourteen (14) days after being served with a copy, any party may serve and file written objections to such findings and recommendations as provided by the Court. If a party has objections, such objections must be timely filed or further appeal is waived. *Thomas v. Arn*, 728 F.2d 813 (6th Cir.), *aff'd*, 474 U.S. 140 (1984).

Copies:    Counsel